IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 6, 2003

## STATE OF TENNESSEE v. BRIAN L. WOODS

**Appeal from the Circuit Court for Dyer County**
**No. C01-137     Lee Moore, Judge**

_____

**No. W2002-01831-CCA-R3-CD  - Filed October 6, 2003**

_____

The Appellant, Brian L. Woods, was convicted by a Dyer County jury of second degree murder and received a twenty-four-year sentence to be served in the Department of Correction. In this appeal as of right, Woods raises the following issues for our review: (1) whether the trial court erred by permitting a witness to testify in violation of the rule of sequestration; (2) whether the evidence is sufficient to support his conviction; and (3) whether his sentence of twenty-four years is excessive. After a review of the issues presented, we conclude that Woods' challenges are without merit. The judgment of conviction and sentence are affirmed.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed.**

DAVID G. HAYES, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, J., joined; JOE G. RILEY, Not Participating.

Clifford K. McGown, Jr., Waverly, Tennessee, for the Appellant, Brian L. Woods.

Paul G. Summers, Attorney General and Reporter; Michael Moore, Solicitor General; Brent C. Cherry, Assistant Attorney General; C. Phillip Bivens, District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**Factual Background**

On February 12, 2001, around 7:10 p.m., the Appellant "was walking on Wilson Circle," on the west side of Dyersburg, when "he noticed a maroon car, and a gentlemen in the car . . . fired a gun at him and . . . struck him in the back." The Appellant advised officer Mark Reynolds that Devon Wiggins, a/k/a "Dee-Dee," was the man who shot him. The Appellant wanted to sign a warrant against Wiggins and proceeded to the clerk's office to do so. The Appellant did not indicate that any other individual was involved in the shooting at this time.

According to Reynolds, while he and the Appellant were at the clerk's office, "I did notice a small hole in the hood of the [Appellant's] jacket. After I got to looking at the hole in the hood, it's pretty close to where his injury was on his back. I began to examine the hole and recovered a round from the hole." Although there was no broken skin, the Appellant had a severe "dime-sized" bruise on his back with "a little blood to the surface of the skin" and "a little swelling around" the wound. He declined medical treatment. After the Appellant left the clerk's office, he told Kelvin Taylor, the co-defendant in this case, that two persons known as "Dee-Dee" and "Mar-Mar," a/k/a Lamar Johnson, the victim in this case, had shot at him.

That same evening, the Appellant went to the east side of town to the home of Karen Smith. At some point during the evening, he obtained a SKS assault rifle. According to Sierra Smith, the daughter of Karen Smith, when the Appellant saw Johnson, he said, "I'm fixin' to go get that nigger," left the porch, and went behind the house. As Johnson was standing in front of a neighboring home, the Appellant fired at least twelve shots at the victim. The victim was struck twice, once in the back and once in the left hip, and died as a result of his wounds. Upon examination of the body, a pistol was found underneath Johnson's body near his feet. The weapon's safety was set, the magazine was full, and it appeared that the weapon had not been recently fired. At trial, the Appellant testified that he shot Johnson because he believed Johnson was shooting at him and "they was constantly aggravating me." Additionally, subsequent ballistics tests revealed that the bullet recovered from the Appellant's jacket was not fired from the pistol found under Johnson's body.

On April 9, 2001, a Dyer County grand jury indicted the Appellant and Kelvin Taylor for the first degree premeditated murder of Lamar Johnson. After a trial by jury in April of 2002,[1] the Appellant was convicted of second degree murder. A sentencing hearing was held, and the trial court sentenced the Appellant to twenty-four years in the Department of Correction. The Appellant's motion for new trial was denied, and this timely appeal followed.

## ANALYSIS

### I. Sequestration Rule

First, the Appellant argues that the trial court erred by allowing Rene Pritchard to testify in violation of Rule 615 of the Tennessee Rules of Evidence. The following facts are relevant to the Appellant's argument. Tashana Brown testified that, prior to the shooting of Johnson, she observed an automobile attempt "to run over" the Appellant. She stated that a woman named "Carletha" was driving the automobile, and Wiggins and Johnson were passengers in the vehicle. The Appellant later testified regarding the same incident. He identified the two men in the automobile but did not mention the woman who was allegedly driving the automobile. When asked why these two men harassed him, the Appellant stated, " I don't know the reason. I still ain't found out till this day. .

---

[1]The Appellant and Taylor were tried separately.

. . I never did nothin' to nobody down here but mind my own business." Thereafter, Pritchard advised the district attorney general

> that she [knew] Carletha, that she observed Mr. Woods assault Carletha, that Carletha was Devon Wiggins' girlfriend at the time, and that that's what caused the ill feeling between – or at least one of the things that caused ill feeling between Carletha and Devon Wiggins that would cause Carletha to attempt to run over Brian Woods. . . .

The State called Pritchard as a rebuttal witness. The defense objected to her testimony because she had been present in the courtroom throughout the trial. The State contended that it did not become aware of Pritchard's testimony, and the need for it, until after the Appellant testified. The trial court permitted Pritchard to testify despite the violation of the rule of sequestration.

> Rule 615 of the Tennessee Rules of Evidence provides:
>
> At the request of a party the court shall order witnesses, including rebuttal witnesses, excluded at trial or other adjudicatory hearing. In the court's discretion, the requested sequestration may be effective before voir dire, but in any event shall be effective before opening statements. The court shall order all persons not to disclose by any means to excluded witnesses any live trial testimony or exhibits created in the courtroom by a witness. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) a person designated by counsel for a party that is not a natural person, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause. This rule does not forbid testimony of a witness called at the rebuttal stage of a hearing if, in the court's discretion, counsel is genuinely surprised and demonstrates a need for rebuttal testimony from an unsequestered witness.

The sequestration rule is designed to prevent witnesses from hearing the testimony of other witnesses and subsequently adjusting their testimony. *State v. Harris*, 839 S.W.2d 54, 68 (Tenn. 1992). Rule 615 is mandatory and may be invoked at any time. *State v. Anthony*, 836 S.W.2d 600, 605 (Tenn. Crim. App. 1992).

Rule 615 does not prescribe a specific sanction for its violation. Instead, a court may impose a variety of sanctions appropriate to the circumstances. *Anthony*, 836 S.W.2d at 605; *see also* NEIL P. COHEN ET AL., TENNESSEE LAW OF EVIDENCE § 6.15[11][b] (4th ed. 2000). The trial court may, as a sanction, exclude the testimony of a witness who hears other testimony while subject to a sequestration order. *State v. Black*, 75 S.W.3d 422, 424 (Tenn. Crim. App. 2001), *perm. to appeal denied*, (Tenn. 2002) (citing *State v. Weeden*, 733 S.W.2d 124, 125 (Tenn. Crim. App. 1987)). In the most egregious case, the trial court may declare a mistrial. *Anthony*, 836 S.W.2d at 605. Even when the trial court does not declare a mistrial, the witness may be cross-examined regarding the violation and the jury may be instructed to consider the violation in assessing the witness' credibility. *Id*. "The generally accepted procedure in Tennessee . . . is for the court to hold a jury-out hearing

to determine both the facts of the violation and whether a party was prejudiced by the violation." COHEN ET AL., *supra*, § 615 [11][e]. The decision to exclude or allow the testimony is a matter within the discretion of the trial court, subject to a showing of abuse and prejudice to the complaining party. *Black,* 75 S.W.3d at 424-25 (citing *State v. Chadwick*, 750 S.W.2d 161, 166 (Tenn. Crim. App. 1987)).

In the instant case, the trial court found that the State was taken by "genuine surprise" by the existence of Rene Pritchard and the nature of the testimony she could provide. Furthermore, the trial court found that:

> It also appears to me that it is strictly rebuttal proof, and it does directly contradict some things that your client said, and also some things that – well, it directly contradicts some things that your client said, not only about the cause of the rift between the victim and the defendant, but also, – it is a bad act, but it also impeaches his testimony.

We agree. The Appellant contends that the State "could have discovered Ms. Pritchard as a witness with the exercise of reasonable diligence." However, the Appellant's argument is misplaced. While the State may have been able to discover, through reasonable diligence, the existence of Carletha, the same is not true for Pritchard. No witness identified Pritchard as a possible source of information either before or during trial. Only through Pritchard initiating contact with the district attorney general did he become aware that she had knowledge of relevant events. This information was not reasonably available to the State through any other avenue.

Furthermore, the State demonstrated a need to present Pritchard's testimony for impeachment purposes and to rebut the inference made by the Appellant that the cause of the "rift between the victim and the [Appellant]" was unknown. Pritchard was cross-examined about her presence in the courtroom throughout the trial. The Appellant was also permitted to call Toccara Taylor as a surrebuttal witness. Taylor testified that the Appellant "beat up" Carletha only after "she tried to run him over." According to Taylor, at some time thereafter, Johnson "pulled out a gun and he was pointing it at [the Appellant], and he said he tired of this nigger, and he said he was gonna shoot him[.]" Additionally, the trial court gave the following limiting instruction concerning Pritchard's testimony:

> In considering – the Court is going to charge you in the final instructions on the issue of credibility of witnesses, and there are some pattern instructions on the credibility issue. However, Rene Pritchard was called as a rebuttal witness. As far as her credibility is concerned as a witness, you may consider the fact that she was sitting in court during the entire trial and has heard the testimony of all the other witnesses.

We conclude that the trial court did not abuse its discretion in allowing Pritchard to testify and that the Appellant has not shown he was unduly prejudiced by Pritchard's presence in the courtroom and her subsequent testimony.

## II. Sufficiency

The Appellant argues that the evidence was insufficient to support his conviction for second degree murder. Specifically, he contends that:

> This is a self-defense case. It is not disputed that Mr. Woods shot and killed Mr. Johnson. It was proven at trial that Mr. Woods had been shot at[,] had a gun pulled on him by Mr. Johnson[,] and almost run down.

It is respectfully submitted that Mr. Johnson provoked his own death. He was armed, and had just shot at Mr. Woods that same night. At best a verdict of manslaughter could be supported by the evidence. A person of Mr. Woods' mental capacity, who had been subject to the repeated assaults and attempts on his own life, did not commit second degree murder under the facts of this case.

A jury conviction removes the presumption of innocence with which a defendant is cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). In determining the sufficiency of the evidence, this court does not reweigh or reevaluate the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Likewise, it is not the duty of this court to revisit questions of witness credibility on appeal, that function being within the province of the trier of fact. *State v. Holder*, 15 S.W.3d 905, 911 (Tenn. 1999); *State v. Burlison*, 868 S.W.2d 713, 719 (Tenn. Crim. App. 1993). Instead, the Appellant must establish that the evidence presented at trial was so deficient that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *State v. Cazes*, 875 S.W.2d 253, 259 (Tenn. 1994). Moreover, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

The Appellant argues that the evidence produced at trial supports an acquittal based upon self-defense and not a conviction for second degree murder. In order to establish a claim of self-defense, a defendant must show that the danger of death or serious bodily harm was imminent and impending, manifested by some words or overt acts at the time clearly indicative of a present purpose to do injury. Tenn. Code Ann. § 39-11-611(a) (1997). In other words, the Appellant, in order to prevail on a claim of self-defense, must show that he acted upon a well-founded apprehension of great bodily injury and that the actions he took were necessary. *State v. Wilson*, 556 S.W.2d 232, 234 (Tenn. 1977).

The jury heard testimony that there had been prior acts of violence by Wiggins and Johnson towards the Appellant, including attempts to run him over, pulling a weapon on him, and then

ultimately shooting at him on the evening of the murder. However, none of the witnesses' testimony supports a theory of self-defense or that the Appellant was confronted with imminent danger of death or serious bodily injury at the time he shot Lamar Johnson. Only the Appellant's testimony, although materially contradicted at times, supports a theory of self-defense. Whether a killing of one person by another occurs under circumstances which justifies the act under the doctrine of self-defense or is the result of some other motive is a question of fact to be determined by the jury under proper instructions and from consideration of all the evidence. *State v. Goode*, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997). Obviously, the jury is not obligated to accept only the Appellant's testimony as to self-defense. By their verdict, the jury rejected the Appellant's self-defense theory, as was their prerogative.

Additionally, the Appellant contends that the facts of this case support, at best, a conviction for voluntary manslaughter not second degree murder. Second degree murder is the "knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1) (1997). A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. Tenn. Code Ann. § 39-11-106(a)(20) (1997). The evidence established at trial reveals that several hours had passed between the time the Appellant was shot and the murder of Johnson. The trial court summarized the facts as follows:

> Mr. Woods then went . . . across town to a place where he knew the victim would come eventually that night. He lay in wait. . . . Actually went around to the side of the house where it was dark either where he had a better view of the victim or where the victim could not see him and then shot the victim in the back and shot the victim when he was running or trying to get away. . . . [I]t was an execution style slaying.

When the evidence is conflicting, the jury must resolve these conflicts under proper instructions and, as in this case, decide whether the homicide was murder, voluntary manslaughter, reckless homicide or criminally negligent homicide.[2] Intent, which can seldom be proven by direct evidence, may be deduced or inferred by the trier of fact from the character of the Appellant's conduct, the nature of the act, and from all the circumstances surrounding the commission of the offense. *See State v. Holland*, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993); *see generally State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997). We conclude from the proof at trial that a rational trier of fact could have found beyond a reasonable doubt that the Appellant acted "knowingly" and that he was aware that his conduct was reasonably certain to cause the result it produced. Thus, this issue is without merit.

---

[2]The record indicates that the trial judge submitted instructions on each of these offenses. Thus, in this case, it was for the jury to determine whether the killing of the victim occurred in a state of passion produced by adequate provocation, whether these acts were recklessly committed, or whether the Appellant "knowingly" fired upon Johnson in seeking retribution.

### III. Sentencing

The Appellant argues that his twenty-four-year sentence as imposed by the trial court was excessive. When an accused challenges the length, range, or the manner of service of a sentence, this court has a duty to conduct a *de novo* review of the sentence with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d) (1997); *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *Ashby*, 823 S.W.2d at 169. When conducting a *de novo* review of a sentence, this court must consider: (a) the evidence, if any, received at the trial and the sentencing hearing; (b) the pre-sentence report; (c) the principles of sentencing and arguments as to sentencing alternatives (d) the nature and characteristics of the criminal conduct involved; (e) any statutory mitigating or enhancement factors; (f) any statement that the Appellant made on his own behalf; and (g) the potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, -210 (1997); *Ashby,* 823 S.W.2d at 168. Furthermore, we emphasize that facts relevant to sentencing must be established by a preponderance of the evidence and not beyond a reasonable doubt. *State v. Winfield,* 23 S.W.3d 279, 283 (Tenn. 2000) (citing *State v. Poole,* 945 S.W.2d 93, 96 (Tenn. 1997)).

In determining the Appellant's sentence, the trial court applied the following enhancement factors: (1) The Appellant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range; (8) The Appellant has a previous history of unwillingness to comply with the conditions of a sentence involving release into the community; (9) The Appellant possessed a firearm during the commission of the offense; (10) The Appellant had no hesitation about committing a crime when the risk to human life was high; and (16) The crime was committed under circumstances under which the potential for bodily injury to a victim was great. Tenn. Code Ann. § 40-35-114(1), (8), (9), (10), (16) (1997).[3]

While the Appellant does not challenge the application of any of these enhancement factors, upon *de novo* review we find that application of enhancement factor (16), the crime was committed under circumstances under which the potential for bodily injury to a victim was great, was improper. This court has defined "victim" as being limited in scope to a person or entity that is injured, killed, had property stolen, or had property destroyed by the perpetrator of the crime. *State v. Raines*, 882 S.W.2d 376, 384 (Tenn. Crim. App.), *perm. to appeal denied*, (Tenn. 1994). There cannot be multiple victims for any one offense where the indictment specifies a named victim. *State v. Imfeld*, 70 S.W.3d 698, 706 (Tenn. 2002). "There is nothing in the statutory language of the enhancement factor (16) to indicate that it applied to potential victims or that it applies simply because the offense was committed in the presence of other individuals." *Id*. The Appellant was convicted of an offense involving a specifically named victim in the indictment for murder, and the great potential for bodily

---

[3]We note that because of recent renumbering of the enhancements factors under Tennessee Code Annotated Section 40-35-114 (Supp. 2002), the correct enhancement numbers are now (2), (9), (10), (11), and (17).

injury always exist with a second degree murder. *State v. Nix*, 922 S.W.2d 894, 903 (Tenn. Crim. App. 1995). Accordingly, the trial improperly applied enhancement factor (16).

Due to the erroneous application of an enhancement factor, we will review the sentencing decisions of the trial court *de novo* with no presumption of correctness. *Poole*, 945 S.W.2d at 96. However, the wrongful application of one or more enhancement factors by the trial court does not necessarily lead to a reduction in the length of the sentence. *Winfield*, 23 S.W.3d at 284. This determination requires that we review the evidence supporting any remaining enhancement factors as well as the evidence supporting any mitigating factors. *Imfeld*, 70 S.W.3d at 707.

The Appellant does not contest the application of enhancement factor (1), a previous history of criminal convictions in addition to those necessary to establish the appropriate range, and we find that it was properly applied. The Appellant's criminal history includes convictions for aggravated assault and possession of cocaine with intent to sell.[4] Such past criminal behavior adequately supports enhancement factor (1). Enhancement factor (8), a previous history of unwillingness to comply with the conditions of a sentence involving release into the community, applies to the Appellant's conviction as the record reflects that he "had been on probation before in Shelby County and that probation was revoked in full." Furthermore, the record unquestionably shows that the Appellant possessed a firearm during the commission of the offense. Accordingly, enhancement factor (9), also applies to the Appellant's conviction for second degree murder.

Finally, regarding enhancement factor (10), no hesitation about committing a crime when the risk to human life was high, the record reflects that:

> Because there is necessarily risk to life of the victim when he's killed but in this case the risk was to Ms. Taylor, her daughter and her friend that were in the apartment when he fired these shots at Mr. Johnson. The testimony at trial was that there were some 20 shots or approximately 20 shots fired. Ms. Taylor's testimony was they were in the apartment, in the residence, at the time when these shots were fired and these – at least one of these shots entered her residence where the – So there definitely is a risk to human life to other individuals when shots were being fired like that. Especially at an apartment which is an occupied apartment or residence. . . .
>
> . . . Plus, this was a public street and with numerous units of public housing on that street. . . .

Enhancement factor (10) may be applied in circumstances where individuals other than the victim are in the area of the Appellant's criminal conduct and are subject to injury. *State v. Sims*, 909 S.W.2d 46, 50 (Tenn. Crim. App. 1995) (distinguished on other grounds). We conclude that the record sufficiently corroborates the application of enhancement factor (10).

---

[4]We glean these facts from the entire record as a presentence report is not included in the record.

The trial court also applied the following two mitigators in fashioning the Appellant's sentence: (8) The Appellant was suffering from a mental or physical condition that significantly reduced the Appellant's culpability for the offense; and (13) Any other factor consistent with this provision. The trial court, in applying these two factors, found:

> Looking at the record for mitigating factors, Mr. Woods did turn himself in the day after the incident occurred. And the Court could give him credit as to number 13 for that. . . . [T]he Court does recognize that he was in special education classes while he was in school. He quit school after the 8th grade. Number 8 would apply. . . The Court will give him credit for those mitigating factors. But the Court doesn't place a whole lot . . . of weight on those because under the law he knew what he was doing. He was capable of helping you prepare his defense. And he had the capability of appreciating what he . . . had done.

The Appellant's entire sentencing argument consists of the following statement: "Defense counsel made a well reasoned argument to the trial court concerning the defendant's IQ, 70 to 84. His mental capacity is directly linked to his judgment, or lack thereof. He was provoked, have (sic) been shot at earlier." The weight to be afforded an existing factor is left to the trial court's discretion so long as the court complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record. *State v. Boggs*, 932 S.W.2d 467, 475 (Tenn. Crim. App. 1996). The weight to be afforded mitigating and enhancement factors derives from balancing relative degrees of culpability within the totality of the circumstances of the case involved. *Id.* at 476; *see also State v. Marshall*, 870 S.W.2d 532, 541 (Tenn. Crim. App. 1993). We conclude that the record supports the trial court's decision to give these factors minimal weight.

The sentencing range for second degree murder, a class A felony, is fifteen to twenty-five years. Tenn. Code Ann. § 40-35-112(a)(1) (1997). The court is required to begin its sentencing consideration at the midpoint of the range, twenty years. Tenn. Code Ann. § 40-35-210(c) (Supp. 2002). From this presumptive sentence, the court should enhance the sentence as appropriate considering applicable enhancement factors and then reduce the sentence for any applicable mitigating factors. Tenn. Code Ann. § 40-35-210(e). Upon *de novo* review, we conclude that enhancement factors (1), (8), (9), and (10) are of particular weight and that mitigating factors (8) and (13) are of little weight in this case. Under these circumstances, a sentence of twenty-four years is justified. This issue is without merit.

## CONCLUSION

Based upon the foregoing, we find that the trial court did not err in permitting the rebuttal testimony of Rene Pritchard despite the violation of the sequestration rule. The evidence was sufficient to sustain the Appellant's conviction for second degree murder. We further conclude that the twenty-four-year sentence imposed by the trial court was not excessive as to length. Accordingly, the judgment of the Dyer County Circuit Court is affirmed.

_____
DAVID G. HAYES, JUDGE